UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | | |
|---|---|---|
| KALI TREE TOP, AS ADMINSTRATOR OF THE ESTATE OF CATHERINE MINER, DECEASED, and INDIVIDUALLY AS A SURVIVOR,<br><br>                Plaintiff,<br>v.<br><br>UNITED STATES OF AMERICA,<br><br>                Defendant. | Case No.  5:19-cv-5068<br><br><br><br>COMPLAINT | |

Plaintiff, by and through her undersigned Attorney, hereby complains and alleges as follows:

## I.  JURISDICTION AND VENUE

1.  This action arises under the Federal Tort Claims Act, 28 United States Code, Sections 2671 *et seq.*, as amended, and is brought by the plaintiff against the defendant United States of America and its agencies Department of Health and Human Services, Public Health Service-Indian Health Service.  This court has jurisdiction pursuant to 28 U.S.C. Section 1346(b).

2.  Venue is proper in the United States District Court for the District of South Dakota because the acts and omissions complained of herein arose in Eagle Butte, South Dakota on the Cheyenne River Sioux Reservation, which is within South Dakota.

## II.  THE PARTIES

3.  Plaintiff hereby incorporates the facts set forth in Paragraphs 1 through 2 above, as if fully stated herein.

4.  Plaintiff's mother Catherine Miner was an enrolled member of the Cheyenne River Sioux Tribe residing on her Reservation in Eagle Butte, South Dakota where she raised and supported her family.  For her primary medical care, Catherine Miner went to the Defendant's Indian Health Service Hospital on the Cheyenne River Sioux Reservation many times throughout her life and depended on that medical care. She was entitled to reasonable medical care from the Defendant's facilities, agents, employees, and others acting on Defendant's behalf at the Cheyenne River Health Center Indian Health Service Hospital in Eagle Butte, South Dakota, which is operated for the benefit of Tribal members on the Cheyenne River Sioux Reservation.

5.  Defendant failed to provide Catherine Miner reasonable medical care and deviated below the professional standard of care, causing her pain and suffering, which caused or contributed to cause her wrongful death on May 30, 2017, devastating her survivors and depriving her children and relatives of her care, support, love, affection and companionship.  Kali Tree Top, as a surviving daughter of Catherine Miner, brings this wrongful death and survival action as Administrator of her mother Catherine Miner's Estate, and individually in her capacity as a surviving daughter.

6.  The Indian Health Service is an agency of Defendant United States of America's Department of Health and Human Services, Public Health Service (hereinafter, Defendant and its agents shall be referred to as "Indian Health Service" or "I.H.S.").  The Indian Health Service is federally mandated to provide health care to Tribal members on the reservation, and owed Catherine Miner a duty to exercise reasonable medical care.  The Indian Health Service is the principal federal health care provider and health advocate for Indian people, and its "goal is to raise their health status to the highest possible level."  Indian Health Service website, https://ihs.gov .

2

7.   The Indian Health Service owns, operates, and/or manages a Hospital in Eagle Butte, South Dakota known as the P.H.S. Indian Hospital Indian Health Service – Cheyenne River Health Center, for the benefit of tribal members like Catherine Miner. While she was a patient, the Indian Health Service was providing medical care, treatment, diagnosis, and services through its facilities, agents, servants, employees, physicians, physician assistants, pharmacy doctors, radiologists, radiologist technicians, specialty nurses, nurse practitioners, contract care staff, administrators and others who were acting within the course and scope of their employment, office, or agency with the Indian Health Service or acting on Defendant's behalf.   As such, they owed Catherine Miner the duty to treat, observe and otherwise exercise reasonable medical care in accordance with the prevailing professional medical standard of care, but they deviated below that standard of care.

8.   The Indian Health Service has an Electronic Records system that allows its providers to pull up records and makes patient information available to all providers, and they should have seen and read Catherine Miner's records every time she went to Indian Health Service.   In addition, the Indian Health Service self describes its quality of care as "Excellence in everything we do to assure a high-performing Indian health system."  Indian Health Service website at https://ihs.gov .

### III.  STATEMENT OF MATERIAL FACTS

9.   Plaintiff hereby incorporates the facts set forth in Paragraphs 1 through 8 above, as if fully stated herein.

### August 19, 2016

10.  On August 19, 2016, Catherine Miner presented for medication refills at the Indian Health Service Hospital in Eagle Butte.  A nutrition screen was completed and noted at 1:14PM. Nurse Practitioner Carmen Redlin noted Catherine was "here for refills" and denied complaints, but decided to give her an exam and began "digging into her chart" anyway.  Nurse Redlin's physical

exam notes that Catherine's body mass index was 21.51, her weight was 106.5 pounds, and that she "appears to be well nourished and seems in a good state of health."  The initial part of her exam incorrectly stated that the lung exam was normal with "no rales or crackles", but after the patient left, Nurse Redlin filed an addendum stating the "lung exam showed rhonchi bilaterally."  She used a measurement of 1 inch during her abdominal exam but standard medical practice describes anatomical measurements in centimeters and millimeters, not inches.  She described the patient as having multiple amputated fingers, but she was only missing the tip of one – her right index finger.  Despite noting hypertension and interstitial lung disease, noting abnormal cough and wheeze with shortness of breath, and that she had not seen her cardiologist, rheumatologist, or pulmonologist in over a year, no chest x-ray was ordered.  A chest x-ray should have been ordered.

### September 6, 2016

11.  On September 6, 2016, Catherine went to the heart doctor in Rapid City with her daughter, but the Heart Doctor would not do the labs for her blood work.  The cardiologist did not want to perform the test because they were not sure that Indian Health Service Contract Care would pay for it, so they sent her back to Indian Health Service to do the bloodwork.

### September 7, 2016

12.  The next day, September 7, 2016, Catherine and her daughter went to Indian Health Service in Eagle Butte and told I.H.S. appointment/intake screener Airess Bowker, N.A., that the heart doctor in Rapid City didn't want to do the bloodwork and they had come back to I.H.S. for that lab work.  Nurse Bowker's entered her note at 10:09AM, which reported Catherine was just there for "Medication refills and Lab tests".  Nurse Delores Aguilar's note also reported Catherine was just there for labwork ("PT reports she seen the Regional Heart Doctors yesterday and states "They said everything looked good." Pt here requesting labwork for that visit.  Provider given script

4

for this today.")  Nurse Aguilar also reported that she sent the "report to provider" at 10:23AM, and "PT sent to lab" at 10:26AM.  Catherine was not given any instruction to return to the exam room after the labs and was not escorted to the lab.  All of Catherine's medication prescriptions were good through August 20, 2017.  When the labwork was done, Catherine and her daughter left and went home as nobody told her she had to see anyone or go back. Later, at 11:50AM, nearly an hour and a half after Catherine was sent to the lab, I.H.S. Dr. Cindy Pochop entered an incomplete note stating "pt eloped after lab, was not seen".   However, both nurse's notes show Catherine came in on her own just for lab work and Dr. Pochop should have seen them if she actually had reviewed the records.  Although Dr. Pochop did take time to blame the patient, she never actually saw Catherine in the exam room and Catherine was not there to see a doctor. If Dr. Pochop thought that she needed to examine Catherine, she never communicated that or went into the exam room to see the patient. Dr. Pochop did not schedule any further treatment or referral from this exam, did not contact Catherine Miner for follow up care, did not send her a letter, call, send C.H.R.'s, or reach out to her in any manner.

### October 19, 2016 – Dr. Saira Khan

13.  On October 19, 2016 Catherine Miner's daughter Kali Tree Top made an appointment for her with the I.H.S. Clinic in Eagle Butte, South Dakota.  She had a cough that she couldn't seem to get rid of, some headaches, fever and chills.  Her daughter noticed the persistent cough and called specifically to ask for an appointment with a doctor at I.H.S.  Catherine had told her daughter that she wasn't enthused about going and said "I don't know what for all they ever do is give me cough syrup and antibiotics, that's all they ever do."  Kali said "let's just go get it checked anyway."  They were scheduled to see Dr. Khan and arrived at the I.H.S. at about 1:45PM.  Vitals were taken at 1:52PM and her pain assessment was recorded as 6.  Scottie Laundreaux, C.N.A. screened her at

1:54PM, noting "congestion," and "NPO/poor appetite more than 3 days."  I.H.S. failed to address this poor appetite complaint.

14.     At 2:00PM, Catherine Miner was seen by Nurse Sandra J. Haskell, R.N., who also recorded pain as 6, and described it as moderate, throughout her whole body, burning and intermittent. Nurse Haskell notified the provider at 2:06PM.  With her daughter present, Catherine was seen by I.H.S. Doctor Saira Khan at 2:18PM.  Dr. Khan listed the purpose of the visit as cough, scleroderma, with organ and system involvement, and sore throat symptoms.  A throat culture was ordered by Dr. Khan, but it was not completed because I.H.S. ran out of culturettes per Nurse Haskell's note (entered at 5:00PM).   Apparently Dr. Khan did not know what to prescribe Catherine who had allergies to certain medicines, so she contacted the I.H.S. pharmacist Lawrence E. Patterson, Pharm. D. who put a note in the chart at 2:28PM stating: "_this is a 66 year old patient whom provider feels has symptoms of an infection._  *Allergic to erythromycin, Keflexin, and penicillin.  I would recommend Levaquin 500mg 1 daily for _5 days_.  So Dr. Khan then gave 500mg daily for _7 days_ ... continued prednisone.  _Doctor Khan consulted me_ thank you very much*."   At 2:39PM Dr. Khan entered a note indicating that she gave Catherine Levaquin for 7 days and enough cough syrup for 118 days, with 6 refills.  This seemed excessive cough treatment for what Dr. Khan had deemed a minor infection.  As a medical doctor, Dr.  Khan should already have known what to give a patient who was allergic to those medicines without having to ask the pharmacist for advice.  It didn't appear that Dr. Khan knew basic primary care or that she had taken the time to research this for the care of her patient.

15.  Blood work showed her platelets were marginally elevated at 509.  Dr. Khan listened to Catherine's heart and lungs, took her pulse, visited with Catherine and her daughter, then said she thought Catherine might have a bronchitis but that she would take an X-ray.  Catherine and

her daughter were taken to the X-ray lab, an X-ray was taken, and they were taken back to the

exam room.  The nurse came in and asked if they needed anything and they said they didn't.  Dr.

Khan came back and said that there was some "cloudiness" in her lungs that could be the cause of

the congestion and cough and then asked if she had a fever and when she had a pneumonia shot then

told her it's almost 5 O'clock and the CT Lab is shutting down, "would it be all right, if we need to,

to call you back in?"  Catherine said yes that would be fine.  Dr. Khan never said anything about

masses to Catherine or her daughter.  Dr. Khan said she was going to give her some guaifenesin and

an antibiotic and she would be in touch.  The CT scan should have been done on that day because

CT scans can be done around the clock in this facility.  CT scans can be done around the clock in

this facility so there should not have been any reason at all that Catherine could not have had one

done that very day.  That was a crucial failure.  Dr. Khan sent Catherine home instead of completing

the CT or hospitalizing her until it was done.  Dr. Khan failed to give any alarm or urgency.  Dr.

Khan failed to adequately inform Catherine of the severity and nature of her condition.  She never

reached out to Catherine or called her, never sent her a letter, or followed up on her chart about the

cloudiness, the X-rays or the need for a CT.   She said nothing about warning Catherine of the

possibility of cancer nor did she refer her to a specialist.

16. As indicated in Dr. Khan's progress note which was entered at 4:35PM and

electronically signed at 4:40PM, Dr. Khan made no future appointments with Catherine ("Future

Appt:  None found"), and Dr. Khan failed to follow up ("Follow up in __ months").  Dr. Khan's

assessment was 1 cough, 2 scleroderma with organ system involvement, and 3 sore throat system,

however, she failed to mention X-ray results or any indication of suspected neoplasm in this section

of her report.  Dr. Khan's "PLAN" states she "advised patient to maintain a healthy lifestyle stay

hydrated and take rest."  Dr. Khan also claims she gave lab results and x-ray results to the patient",

her note repeats part of the X-ray report, and then states *"Would order a CT, patient will come to get CT tomorrow: If has fever chills chest pain difficulty in breathing visit that clinic/ER p.r.n. Patient verbalizes understanding and agrees with the plan."*  However, as explained above all that was said was that since it was close to 5:00PM and CT would be closing and that they would call her back if they needed to.  Dr. Khan never said anything about masses to Catherine or her daughter nor gave them any reason to be overly concerned.   As they were leaving Catherine elbowed her daughter and said "see I told you all they were going to do was give me antibiotics and cough syrup."  Kali laughed and said "well at least it's nothing serious."  Dr. Khan failed to adequately explain the serious nature and gravity of Catherine's condition to Catherine Miner or her family.

   17.  Dr. Khan and I.H.S. should have gotten a hold of Catherine through whatever means possible.  I.H.S. could have used the C.H.R.'s for that as she lived right in Eagle Butte.  It makes it worse that she had a phone and nobody called her.  Dr. Khan failed to follow up.  If Dr. Khan's report and the X-ray results suggesting a CT be done were actually reported in the Indian Health Service Electronic Records System, then this information was available every time the records were pulled up and should have been seen, reviewed and acted on by every Indian Health Service provider that saw her after the October 19, 2016 appointment.

   18. Catherine Miner would have had more options if Dr. Khan had performed the CT Scan on October 19, 2016.  She would have had better survival chances, and a better quality of life.

   19.  Dr. Saira Khan owed Catherine Miner a duty to use reasonable skill, care and judgment in treating her condition, but breached this duty and deviated below the standard of care expected of a physician.

   20. Defendant's agency, the Indian Health Service, and Dr. Saira Khan as a primary care physician at the Indian Health Service, undertook the duty to treat Catherine Miner in accordance

with the prevailing professional standards of care of competent and skilled medical practitioners, and in particular to evaluate and interpret the X-rays taken of her on October 19, 2016, to inform Catherine Miner of the results of those X-rays and the need for a CT Scan, to warn her of the dangers of not having a CT Scan, and to inform her of the severity of her condition.  The October 19, 2016 X-rays and radiologist report showed pleural based mass in the right lateral lung base with another mass in the right lower lobe which was available to I.H.S. Doctor Saira Khan, and should have been available to all other medical practitioners who saw and treated Catherine Miner thereafter at the Indian Health Service. There is no evidence that she reported cancer per South Dakota Codified Law section 1-43-14.  Dr. Saira Kahn's substandard medical care, conduct, actions and omissions deviated below the required level of skill for medical doctors and caused or contributed to cause Catherine Miner's pain and suffering and her untimely death on May 30, 2017.

### December 30, 2016 – Physician's Assistant Brent T. Kunzler

21.   Catherine Miner went to the I.H.S. Clinic in Eagle Butte, South Dakota on December 30, 2016 in pain and complaining of cramping in the hands and feet, legs, arm and back, and that "she hasn't been hungry lately".   When she arrived at 5:25PM her pain was at a level of 8 (out of 10), her vitals were taken, and Nurse Candace C. Viet., RN notified the provider at 5:34PM.  Nurse Shawn C. Morse, RN assumed patient care and noted the vitals from Catherine's October 19, 2016 I.H.S. exam by Dr. Khan.  At 5:40PM the provider, Physician's Assistant Brent T. Kunzler, was in the room and explained that he needed to check the chart.  At 6:00PM there were "no orders written, waiting for the provider to make disposition."  At 6:13PM the provider was "at bedside speaking to pt. about her medications, vitals were recorded, and patient discharge instructions given."  She was discharged at 6:25PM.  P.A. Kunzler's exam report describes Catherine as a "very small framed female" and "Well-developed, well-nourished" but he failed to compare her vitals - she lost 1.6

pounds since her last vitals, and she lost 5.5 pounds compared to her vitals in her August 19, 2016
I.H.S. exam.  He reports that patient "states she hasn't been hungry lately" but he failed to address
her hunger complaint. He reports respiration as clear to auscultation bilaterally, but that is
inconsistent with her medical condition and medical history – he should have heard crackles.  He
incorrectly reports that she is missing "parts of her fingers", "phalanges on parts of her both right
and left hands are absent", and "has lost parts of her fingers", but she was only missing the tip of
her right index finger.  He states that she is not on specific medication for her Raynaud's syndrome,
but that is incorrect because she is taking a channel blocker which is one of the standard
medications for Raynaud's.  His note indicates Catherine's pain level was at an 8, yet inexplicably
he reported her pain as "mild" and stated she was in "no acute distress".   He gave her tramadol for
the pain, but tramadol is a poor choice for the elderly.  He diagnosed her condition as "No
Diagnosis Found" and "Raynaud's symptoms of the hands without evidence of circulatory deficits",
but missing parts of one's digits is strong evidence of circulatory deficit.

      22.  P.A. Kunzler had at least 32 minutes to look at Catherine's chart which referred to her
vitals taken at the last I.H.S. visit on October 19, 2016, and he spent 13 minutes with her until
discharge, but he failed to mention Dr. Khan's October 19, 2016 note, the X-ray/radiology report or
any need for a CT Scan.  If P.A. Kunzler really did look at her chart, he had access to her last I.H.S.
visit on October 19, 2016 with Dr. Khan.  If Dr. Khan's report and the X-ray results suggesting a
CT be done were actually reported in the Indian Health Service E.R. system, then this
information was available every time the records were accessed, and should have been seen,
reviewed and acted on.  The vitals that were noted at this visit were from the same date the X-ray
was taken with Dr. Khan who incorrectly claims she told Catherine of the need for a CT Scan.  It
would have been the perfect opportunity to see that, and question whether a CT had been done.  If

on the other hand, that information was not in there, that presents a whole new set of problems

for Dr. Khan and I.H.S.

23.  There is no evidence that he reported cancer per South Dakota Codified Law section 1-

43-14.  P.A. Kunzler owed Catherine Miner a duty to use reasonable skill, care and judgment in

treating her condition, but he breached this duty and deviated below the standard of medical care

expected of a physician's assistant and caused or contributed to cause Catherine Miner's pain and

suffering and her untimely death on May 30, 2017.

### January 11, 2017

24.  On January 11, 2017 at 10:54AM Catherine Miner presented to Indian Health Service

for refills.  She was seen by Lethi B. Pham, RPh at the Pharmacy, who noted that patient requested

refills, no refills remained, and that there were no scheduled appointments or future appointments.

A one month refill was provided for multivitamins.

### April 7, 2017 – Dr. Martin Katambwa

25.  For the next several months Catherine Miner experienced cramping, pain, nausea and

significant weight loss.  She saw I.H.S. Dr. Martin Katambwa on April 7, 2017 for abdominal pain

and vomiting, she could not keep anything down, she was given anti-nausea pills, and sent home.

He failed to compare her vitals with the last visit on December 30, 2016 showing severe weight

loss.  Catherine was only 87 pounds, she had lost 14 pounds in 3 months, and her body mass index

went down from 20.40 to 17.65, but Dr. Katambwa ignored this crucial information and incorrectly

reported she is "Well-developed, well-nourished".   Catherine was in pain and short of breath but

Dr. Katambwa incorrectly reported she was not in pain and incorrectly noted that she denies

"shortness of breath, cough, wheezing."  He also incorrectly reported that her lungs were clear to

auscultation bilaterally when he should have heard crackles.  He diagnosed her condition as

Gastroenteritis.  He also failed to mention the October 19, 2016 X-ray, radiology report, or any notes from Dr. Khan about needing a CT-Scan, assuming that it was in fact in the record, because he should have seen Dr. Khan's notes and the radiologist's findings and the radiology report if they were actually in there when he looked, and if he didn't find a completed CT scan, he should've informed the patient about the CT needing to be done.  If the records were not in there, that would present a whole new set of problems for Dr. Khan and I.H.S.  I.H.S. totally missed this additional opportunity to inform Catherine of the severity of her condition and how urgent a CT scan was needed.

26.   Dr. Martin Katambwa owed Catherine Miner a duty to use reasonable skill, care and judgment in treating her condition, but breached this duty and deviated below the standard of care expected of a physician and caused or contributed to cause Catherine Miner's pain and suffering and her untimely death on May 30, 2017.

27.   Dr. Khan, P.A. Kuntzler, Dr. Katambwa and I.H.S. did not attempt to contact Catherine Miner to notify her that she may be suffering from cancer rather than congestion and cough.

### May 7, 2017 – 1st Visit – Morning - Dr. Martin Katambwa

28.   Catherine Miner saw the same Dr. Martin Katambwa again a month later on May 7, 2017 when she and her daughter demanded that a CT Scan be done.  She arrived at I.H.S. in severe pain with uncontrollable shaking on her right side, cramping all over, very painful muscle spasms every half hour, and shortness of breath. Triage Nurse Mildred Martinez-Sanchez reported that Catherine arrived a wheel chair at 9:45AM and states the chief complaint as "feeling shaky and cramping all over since early this morning", feeling short of breath, and "Denies pain."  However, Catherine was in severe pain, as documented three times: on the ER Triage Information sheet ("very painful"), Nurse Frankie Rousseau ("Pt does c/or chronic back pain:, pain is a level 10 at

10:36AM); Dr. Katambwa ("very painful").  Nurse Martinez made another mistake reporting the respiration rate at 16, but that was dangerously way off – it  was 36, as noted by Nurse Rousseau just ten minutes later, and an hour after that it was still up at level of 32.  At 10:29AM Catherine was given oxygen and an IV, it was reported that Catherine did not like Tramadol because it made her nauseous.

Dr. Katmbwa said he was going to give her a pain shot with something for the nausea and a lorazepam shot for the muscle cramping, but Catherine's daughter questioned him about Catherine's shortness of breath, dizziness, and chest pain, and he had said that she was probably having some anxiety about the shaking and pain and that the lorazepam would take care of that.  The daughter requested that a CT scan be done because Catherine had a cough and was getting winded easily and they were worried that the shaking were some type of seizure because she wasn't getting enough oxygen, or pneumonia.  He told the daughter that he didn't feel a CT of any kind was necessary because the blood work showed low levels of sodium so that could be the cause of her muscle cramping (this is what he called the shaking) so he was going to give her IV fluids. The daughter told him she didn't think the shaking had anything to do with her back, she is shaking only on one side.  He told them that she should have plenty of water at home and was going to send her home. Dr. Katambwa was not going to do a CT Scan.  He failed to mention the October 19, 2016 X-ray or any notes from Dr. Khan about needing a CT Scan.  So Catherine and her daughter had to argue with him to do the CT Scan, and they called Chief Executive Officer Festus Fischer of the Cheyenne River I.H.S. Hospital.  At about 11:33AM Nurse Frankie Rousseau, RN noted that "pt. & family now want a CT."  No new orders were received by 11:37AM.  Then, shortly after their call to Chief Executive Officer Fisher, Dr. Katambwa finally agreed to do a CT Scan.  He now said he would do a chest CT and that he was willing to do whatever the family needed and that he was

13

going to give Catherine some oxygen while they wait for the test and the IV.  At 12:22PM

Catherine was taken to the CT on a hospital bed by the radiology staff.   A CT was done. They

brought her back to the room at 12:36PM, and the provider was notified at 12:42PM.

29.  At about 1:45PM on May 7, 2017 Dr. Katambwa came back after the test and told the

family that there were some very large tumors in her right lung and that it was probably cancer and

that she needed to follow up with the clinic in the morning to get referrals for testing and treatment.

However, he still sent her home instead of using that time to get her in for referrals or hospitalizing

her to ensure expedited care.  He also failed to inform Catherine of the severity of her condition –

how dire it was and how urgent it was to get to her appointments.  In addition, Dr. Katambwa gave

harmful treatment instructions by telling the family to make sure she had plenty of fluids, as they

were later informed by Dr. Jorgenson at Rapid City Regional Hospital that Catherine should have

been told to limit her fluid intake.  He also failed to recognize that Catherine was in respiratory

distress and gave her lorazepam, which represses respirations.  Dr. Katambwa's report indicates that

no medication reconciliation was done, but he ignored her serious weight loss again (Catherine was

down to 85.5 pounds, a loss of 15 &1/2 pounds in 4 months, and her body mass index went down

from 20.40 to 17.27), he ignored reports of loss of appetite, and stated she is "Well developed" in

his report again (like he did the month before on April 7, 2017).  There is no evidence that he

reported cancer per South Dakota Codified Laws section 1-43-14.  Dr. Martin Katambwa's

substandard medical care, conduct, actions and omissions deviated below the required level of skill

for medical doctors and caused or contributed to cause Catherine Miner's pain and suffering and her

untimely death on May 30, 2017.


**May 7, 2017 – 2nd Visit – Evening - Dr. Robert H. Martin, Jr.**


14

30. Just 4 hours later that very same day, May 7, 2017, Catherine was back at I.H.S. in respiratory failure, in severe pain on one side with a severe headache, after her earlier I.H.S. visit where they said she had 2 lung masses that were probably malignant cancer.  In his report Dr. Robert H. Martin, Jr., claims that he examined her but according to the family he did not touch her or come into the room at all.  He came into the doorway of the exam room and asked if she was back for the previous issue and was told that she was in pain.  He said to her "how about I give you a pain shot and some pain pills and send you home, make sure to make that appointment in the clinic." The nurse came back and gave the pain shot and brought the bottle with the 3 day supply of tramadol and then Catherine was sent home, despite the report earlier that same day that tramadol made her nauseous.

31. Dr. Robert H. Martin's report likewise incorrectly states that Catherine Miner was well-developed, well nourished and not in acute distress.  However, she only weighed 85 pounds, was in severe pain on the right side with a headache, and was in respiratory failure with an oxygen saturation of 87%.  Dr. Martin incorrectly reports her lungs are clear.  His report states she is now back with pain, the pain is severe and located in the head and on the right side of her body, but he failed to recognize that the headache may be something serious, and failed to recognize that the dyspnea on exertion and leg pain may actually indicate a pulmonary embolism and/or a DVT.  The medical history in the Doctor's report also failed to mention anything about the need for a CT in Dr. Khan's notes, the X-ray or the radiology reports from 10/19/16.

32. Dr. Robert Martin failed to conduct a physical exam, failed to conduct a thorough medical history, instead he rushed through a cut and paste chart review and sent her home with medications including tramadol despite the report earlier that same day that tramadol made her nauseous.  He noted the she was 'seen in ER earlier today and found to have a right lung mass

15

which is probably Cancer" but as sick as she was in just 4 hours from her last visit pronouncing cancer, he did not hospitalize her or take any action to ensure expedited care and referrals.  He also failed to inform Catherine of the severity of her condition – how dire it was and how urgent it was to get to her appointments. He stated it was "appropriate" for her to set up a referral through the clinic for outpatient follow up.  He entered his note 4 hours after she left the Indian Health Service Emergency Room at 11:48PM, and a minute later he entered an addendum by just copying and repeating the vitals from Nurse Warkentine's Addendum. There is no evidence that he reported cancer per South Dakota Codified Laws section 1-43-14. Dr. Robert Martin's substandard medical care, conduct, actions and omissions deviated below the required level of skill for medical doctors and caused or contributed to cause Catherine Miner's pain and suffering and her untimely death on May 30, 2017.

### May 8, 2017 – May 30, 2017

33.  The next day, May 8, 2017, Catherine's daughter called the IHS clinic and scheduled a same day appointment with Dr. Cindy Pochop.  Daughter went with her to the appointment and states that Dr. Pochop said that her mother had missed several appointments and wanted to know why.  Catherine did not know what she was talking about as she had seen her doctors in Rapid City, South Dakota.  Daughter informed Dr. Pochop that they did have to reschedule appointments when the weather was bad but that the appointments that were set up with Catherine and not with Contract Health were not approved as Contract Health has to set up her appointments and that at a recent Heart Doctors visit they wouldn't do any of the blood work or the other tests that Dr. Pradhan wanted before having it approved by Contract Health so Catherine was sent back home to IHS to have bloodwork done for them.  Catherine's daughter had taken her mother to those medical appointments.  Dr. Pochop asked Catherine why she didn't come back for the CT back in October

16

and Catherine responded that she didn't know that she was supposed to come back for one, all that was said was that since it was close to 5PM and CT would be closing that they would call her back if they needed to.  Daughter confirmed this to Dr. Pochop and informed her that her mother was not called back in and had not received anything in the mail regarding the severity of her condition. Had they been told she had "masses" back in October they would most certainly have pushed for expedited care as they were doing now.  She informed Dr. Pochop that Dr. Khan said that there was some "cloudiness" in her lungs that could be the cause of the congestion and cough and then asked if she had a fever and when she had a pneumonia shot then told her about the CT Lab and said she was going to give her some guaifenesin and an antibiotic and she would be in touch.  Daughter said that they weren't given any reason to be alarmed.  Until May 7, 2017 when the patient and family argued for a CT Scan with Dr. Katambwa, and had to call the C.E.O. to make it happen, nobody at I.H.S. told Catherine or her family about the need for a CT-Scan nor did they order one for her.  In addition, on May 8, 2017 Nurse Laura Hunt, RN reported that "suspected malignant mass was inadvertently found in her lungs during CT and chest xray."

34. Dr. Pochop said to Catherine's daughter Kali there might not be much we can do because they are fairly large.  Dr. Pochop did not hospitalize her or ensure referrals were expedited or even properly done by I.H.S.  The patient was left to do all of this on her own, and I.H.S. contract care failed to send complete paperwork and failed to ensure that appointments were made for at least another 11 days, which delayed her referral to May 24, 2017 when she was hospitalized, then died 6 days later.  Dr. Pochop did not fully inform her of how dire her condition was and how urgent it was for her to get to her referrals immediately.  Instead, she sent her home with medications including tramadol despite the report that tramadol made her nauseous. There is no evidence that she reported cancer per South Dakota Codified Laws section 1-43-14.  Dr. Pochop's

substandard medical care, conduct, actions and omissions deviated below the required level of skill

for medical doctors and caused or contributed to cause Catherine Miner's pain and suffering and her

untimely death on May 30, 2017.

## IV.  CLAIMS

35.  Plaintiff hereby incorporates the facts set forth in Paragraphs 1 through 34 above, as if

fully stated herein.

36.  The defendant, acting by and through its agency Indian Health Service and medical

staff, agents, servants, employees, staff, administrators, facilities and others, all acting within the

course and scope of their agency and employment or office with the defendant, or acting on

Defendant's behalf, were negligent, including but not limited to the following:

(a)  the defendant and its agency Indian Health Service and its medical practitioners, agents,

servants, and employees or others acting on Defendant's behalf failed to exercise reasonable

medical care, deviated below that required standard of care and committed Medical negligence and

medical malpractice, causing her pain and suffering from August 2016 through May 30, 2017 due to

their failure to diagnose, failure to report, failure to refer to specialist, delay in diagnosis, failure to

adequately inform the patient of the severity of her condition and of the dangers of not obtaining

further testing, failure to follow up with a letter or reach out to her, and other conduct, action or

inaction which caused or contributed to cause her untimely death, all constituting medical

malpractice and contributing to and causing her pain and suffering and untimely wrongful death,

devastating her survivors.

(b)  The defendant and its agency the Indian Health Service and I.H.S. medical practitioners,

agents, servants, and employees or others acting on Defendant's behalf failed to timely diagnose

18

Catherine Miner's true condition and failed to perform necessary diagnostic tests required to make a proper and timely diagnosis.  They did not have or exercise the degree of skill, care and knowledge ordinarily exercised by physicians or medical practitioners on the Cheyenne River Sioux Reservation in Eagle Butte, South Dakota, or in similar localities, and are guilty of negligence in failing to conduct a thorough examination so that they would be able to make a proper and timely diagnosis of Catherine Miner's condition.  Instead, the family had to ultimately argue with I.H.S. Dr. Martin Katambwa for a CT scan on May 7, 2017, but by then I.H.S. had wasted too much time in failing to properly diagnose her condition, and in doing so Catherine's options were "limited" according to I.H.S. Dr. Cindy Pochop.  Instead of admitting Catherine to the I.H.S. Hospital as a patient and ensuring she got immediate treatment, three I.H.S. Doctors sent her home.  I.H.S. wasted 11 more days before they sent her completed paperwork to Rapid City, delaying her appointment until May 24, 2017, whereupon she was admitted to the hospital, and she died just 6 days later in Rapid City, South Dakota.

(c)  The delay in diagnosis aggravated the cancerous condition, or at least allowed it to accelerate in an undeterred manner, without any intervening medical treatment, causing harm to other tissues and ultimately shortening Catherine Miner's life expectancy.  An increase in the size of the tumor, no matter how small, due to the delay in diagnosis constitutes sufficient actual damages to sustain the element of injury.

37.  Had defendant and its agency I.H.S. and I.H.S. medical practitioners or others acting on Defendant's behalf conducted a proper and thorough examination of Catherine Miner on October 19, 2016, she would have discovered signs and symptoms sufficiently suggestive of cancer to warrant hospitalizing her for further evaluation and testing.  There would then have been a substantial possibility that she would have avoided suffering a growth of the cancer as appropriate

therapies could have been recommended.  Even if Catherine Miner had not been hospitalized, but had been properly informed of the risk of cancer and the need to seek immediate specialized medical care for testing for treatment of her nonspecific symptoms, at a time when she still had her strength, health and vitality, there is a substantial possibility that she would have received appropriate care, treatment, and testing sufficient to stop the growth of cancer and reduce the risk of the tumors to her overall health.

38.   Had defendant and its agency I.H.S. and I.H.S. medical practitioners or others acting on Defendant's behalf met the duty of care for Catherine Miner, she would have sought and received appropriate care and testing much sooner and in time to prevent her cancer from spreading and metastasizing.  Adherence to the standard of care by the I.H.S. and I.H.S. medical practitioners would, to a reasonable degree of medical probability, have revealed cancer before it metastasized. Treatment at that time would have had a high probability of success back when she still had her strength, health and vitality.

39.   But for defendant and its agency I.H.S. and I.H.S. medical practitioners' negligence, Catherine Miner would not have suffered this advanced cancer which had metastasized and would have timely and altogether have avoided the resultant physical and mental injuries to her body that derive from the advanced cancerous tumors.

40.   Defendant and its agency I.H.S. and I.H.S. medical practitioners or others acting on Defendant's behalf and each of them, in their professional care and treatment of Catherine Miner through their conduct, action or omissions deviated below the required standard of medical care and caused or contributed to cause Catherine Miner's wrongful death, and they were negligent and careless as described above and/or negligent and careless in one or more of the following particulars:

(i) negligently failing to diagnose the cancerous conditions of Catherine Miner and failing to warn her of the urgency and severity of her medical condition:

(ii) negligently failing to take and review an adequate medical history of Catherine Miner on one or more occasions;

(iii) negligently failing to conduct adequate history of Catherine Miner's current symptoms on one or more occasions;

(iv) negligently failing to conduct adequate physical examinations of Catherine Miner on one or more occasions;

(v) negligently failing to properly record data on one or more occasions;

(vi) negligently and carelessly reading and interpreting the results of tests and reports performed on Catherine Miner, and negligently and carelessly failing to inform Catherine Miner of the results of tests and reports performed upon her;

(vii) negligently and carelessly delaying or failing to perform such tests and procedures which would have detected cancer, in light of Catherine Miner's history and symptoms (CT-scan, bronchoscopy, biopsy procedures);

(viii) negligently failing to make early diagnosis of cancer in sufficient time to prevent the cancer from spreading through her body and from metastasizing;

(ix) negligently and carelessly misdiagnosing Catherine Miner's condition;

(x) negligently breaching physician's duty to consult with specialists on medical matters not directly within the physician's expertise, and negligently failing to make a timely referral for Catherine Miner or to seek adequate and timely consultation for her;

(xi) negligently deviating below the requirements of accepted medical practice;

(xii) negligently and carelessly failing to detect and evaluate two tumors in Catherine Miner's lungs that should have been diagnosed and treated in an aggressive manner, and that delay has more likely than not resulted in her death; and

(xiii) negligently and carelessly failing to timely and properly manage, evaluate, diagnose, and treat Catherine Miner's condition resulting in a delay in the diagnosis of lung cancer, a delay in an appropriate plan of treatment, and which delay has more likely than not resulted in her death.

41.  The defendant and its agencies I.H.S. Hospital and I.H.S. medical professionals' or others acting on Defendant's behalf's responsibilities to Catherine Miner (and to Kali Tree Top, as personal representative of Catherine Miner's Estate, who brings these claims on behalf of the said Estate and on behalf of Catherine Miner's beneficiaries) are mandated under Federal and South Dakota law, and said responsibilities are non-delegable.

42. The defendant acting by and through its agency I.H.S and I.H.S. Hospital has direct, vicarious liability for the conduct, actions, errors or omissions committed by any person or entity under its control, including but not limited to: defendant's Indian Health Service and its agents, servants, employees, physicians, physician assistants, pharmacy doctors, radiologists, radiologist technicians, specialty nurses, nurse practitioners, contract care staff, administrators and others acting on Defendant's behalf.

43.  As a direct and proximate result of the negligence by the defendant, its agency I.H.S. and I.H.S. medical practitioners, or others acting on Defendant's behalf, Catherine Miner's cancer metastasized and became inoperable.  The defendant, its agency I.H.S. and I.H.S. medical practitioners increased the risk of harm to Catherine Miner by reducing her chance of survival.

44.  As a direct and proximate result of the breaches of the prevailing professional standard of care by the Indian Health Service, its Hospital, its medical practitioners Dr. Khan, P.A. Kunzler,

Dr. Katambwa, Dr. Martin, and other I.H.S. personnel, or others acting on Defendant's behalf, Catherine Miner died on May 30, 2017. The Indian Health Service, Dr. Khan, P.A. Kunzler, Dr. Katambwa, Dr. Martin, and other I.H.S. personnel or others acting on Defendant's behalf were the legal and proximate cause of Catherine Miner's wrongful death.

45. As a direct and proximate cause of the aforesaid negligent and unskillful acts and omissions arising or resulting from the negligent or wrongful act or omission of the Indian Health Service, its medical practitioners and each of them, while acting within the scope of his or her office or employment, or others acting on Defendant's behalf, Catherine Miner's condition was not alleviated or cured but was greatly aggravated and worsened, she suffered substantial and permanent damage to her body, causing physical deterioration, and other serious ailments were caused to develop, and she suffered great and unnecessary anguish, distress and pain and anger as a result of her knowledge that these disabilities could have been prevented with proper medical care; and she became greatly disordered, reduced and weakened in her ability to engage in normal activities and exercises to such a degree as to render her housebound and disabled from any degree of physical labor or exertion until the cancer had metastasized and was inoperable and she died, losing her life, all earnings, income and profits, all to her damage.

46. As a direct and proximate result of the careless, negligent and/or intentional actions, conduct, errors or omissions and medical malpractice of the Defendant, acting by and through Indian Health Service and its agents, servants, employees, physicians, physician assistants, pharmacy doctors, radiologists, radiologist technicians, specialty nurses, nurse practitioners, contract care staff, administrators and others, all acting within the course and scope of their agency and employment or office with the defendant, or others acting on Defendant's behalf, Catherine Miner suffered pain, mental anguish, bodily injury, death, and lost income, and her surviving

children and relatives suffered mental pain and suffering mental anguish in the form of frustration, emotional turmoil, and anger as a result of her knowledge that these disabilities could have been prevented with proper medical care, and the loss of their mother's companionship, advice, support, comfort, instruction, guidance, services, aid, instruction, moral training, superintendence, society, love, and affection, as well as her future earnings and income, for which compensation and payment is sought for her wrongful death and survivors' action, plus costs and post judgment interest.

47.  If defendant were a private person, defendant would be liable to plaintiff in accordance with the laws of the State of South Dakota.

## V.  ADMINISTRATIVE TORT CLAIM FILED AND RIPE FOR APPEAL

48.  Plaintiff hereby incorporates the facts set forth in Paragraphs 1 through 47 above, as if fully stated herein.

49.  On or about July 10, 2018 Plaintiff timely filed her administrative tort claim for wrongful death and survival claims with the Indian Health Service and the Department of Health and Human Services seeking compensation for a sum certain of $800,000.00, along with an accompanying medical doctor's affidavit.  Defendant's agent Department of Health & Human Services acknowledged receipt of the administrative tort claim on July 18, 2018 ("Your client's administrative tort claim was received in the Claims Office on July 18, 2018.")  In addition, the medical records of Catherine Miner (decedent), proof of representation and representative capacity, and other information was submitted to the Defendant and received by September 4, 2018. Defendant notified Plaintiff two (2) days later that "at this time all CD images opened up and I believe I have everything."

50.  Defendant and its agencies Department of Health & Human Services, Indian Health Service failed to make a timely final disposition of Plaintiff's claims within 6 months after the tort

claim was filed which expired on or about January 18, 2019.  (Six months later Defendant acknowledged its receipt of the tort claim on July 18, 2018).  Additional time went by with no response.  Plaintiff, as claimant, deemed the Defendant's failure to make final disposition within 6 months of filing the tort claim to be a final denial, and Plaintiff is entitled to commence this action pursuant to 28 U.S.C. Section 2675(a).  On May 17, 2019, Defendant subsequently issued a notice of final determination of this administrative tort claim, and denied the claim without giving any reason for the denial, in an arbitrary, capricious and inexplicable manner, making it ripe for appeal.

## VI.  PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Kali Tree Top, the decedent's daughter, as administrator of the Estate of Catherine Miner, brings these claims for $800,000.00 in damages on behalf of the decedent's estate, and also brings them for the survival action on behalf of decedent's survivors, including herself in her individual capacity as a surviving daughter, and makes the following claim for damages: Judgment against the defendant United States of America in the sum of $800,000.00 (Eight Hundred Thousand Dollars), plus costs and disbursements, post-judgment interest, and such other and further relief in Plaintiff's favor that the Court finds necessary, proper, appropriate and/or in the interests of justice.

DATED October 5, 2019.                        Respectfully Submitted for Plaintiffs by:

*/s/ Thomas J. Van Norman*

_____
Thomas J. Van Norman
Attorney at Law
P.O. Box 700
Eagle Butte, S.D. 57625
Phone/fax: (605) 964-8665
Email: tjvannorman@aol.com

JS 44   (Rev. 09/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
KALI TREE TOP, AS ADMINSTRATOR OF THE ESTATE OF CATHERINE MINER, DECEASED, and

**(b)** County of Residence of First Listed Plaintiff   Dewey
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Thomas J. Van Norman
Attorney at Law, P.O. Box 700
Eagle Butte, SD 57625, and phone 605-964-8665

## DEFENDANTS
UNITED STATES OF AMERICA

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
     Plaintiff

☒ 2  U.S. Government
     Defendant

☐ 3  Federal Question
     *(U.S. Government Not a Party)*

☐ 4  Diversity
     *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                    *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans | ☐ 345 Marine Product Liability | Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| (Excludes Veterans) | | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☒ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | ☐ 950 Constitutionality of State Statutes |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original
     Proceeding

☐ 2  Removed from
     State Court

☐ 3  Remanded from
     Appellate Court

☐ 4  Reinstated or
     Reopened

☐ 5  Transferred from
     Another District
     *(specify)*

☐ 6  Multidistrict
     Litigation -
     Transfer

☐ 8  Multidistrict
     Litigation -
     Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 UNITED STATES CODE SECTONS 2671 ET SEQ.
Brief description of cause:
Medical Malpractice, wrongful death and survival actions

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION**
   UNDER RULE 23, F.R.Cv.P.

DEMAND $
800,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE

DOCKET NUMBER

DATE
10/05/2019

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #            AMOUNT            APPLYING IFP            JUDGE            MAG. JUDGE